BRYAN SCHRODER
United States Attorney

WILLIAM A. TAYLOR
JAMES KLUGMAN
CHRISTOPHER D. SCHROEDER
Assistant United States Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: william.taylor@usdoj.gov
Email: james.klugman@usdoj.gov
Email: christopher.schroeder@usdoj.gov

CHAD W. MCHENRY
Trial Attorney
Organized Crime & Gang Section
U.S. Department of Justice
Email: chad.w.mchenry@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:19-cr-00026-TMB-DMS |
| | ) | |
| Plaintiff, | ) | |
| | ) | COUNT 1: |
| | ) | RACKETEERING CONSPIRACY |
| vs. | ) | Vio. of 18 U.S.C. § 1962(d) |
| | ) | |
| | ) | COUNT 2: |
| FILTHY FUHRER, a/k/a "Fuck Face" f/k/a | ) | VICAR CONSPIRACY |
| "Timothy Lobdell," ROY NAUGHTON, | ) | Vio. of 18 U.S.C. § 1959(a)(5) |
| a/k/a "Thumper," GLEN BALDWIN, a/k/a | ) | and (a)(6) |
| "Glen Dog," COLTER O'DELL, CRAIG | ) | |
| KING, a/k/a "Oakie," JUSTIN EATON, | ) | COUNTS 3, 7, 10: |
| a/k/a "Skulls," and FELICIA KING, | ) | KIDNAPPING CONSPIRACY |
| | ) | Vio. of 18 U.S.C. § 1201(c) |
| Defendants. | ) | |
| | ) | |

| | |
|---|---|
| ) | <u>COUNT 4</u>: |
| ) | KIDNAPPING RESULTING IN |
| ) | DEATH |
| ) |   Vio. of 18 U.S.C. § 1201(a)(1) |
| ) | |
| ) | <u>COUNT 5</u>: |
| ) | VICAR MURDER |
| ) |   Vio. of 18 U.S.C. § 1959(a)(1) |
| ) | |
| ) | <u>COUNT 6</u>: |
| ) | ACCESSORY AFTER THE FACT |
| ) |   Vio. of 18 U.S.C. § 3 |
| ) | |
| ) | <u>COUNTS 8, 11</u>: |
| ) | KIDNAPPING |
| ) |   Vio. of 18 U.S.C. § 1201(a)(1) |
| ) | |
| ) | <u>COUNTS 9, 12</u>: |
| ) | VICAR ASSAULT |
| ) |   Vio. of 18 U.S.C. § 1959(a)(3) |
| ) | |

<u>F I R S T   S U P E R S E D I N G   I N D I C T M E N T</u>

The Grand Jury charges that:

GENERAL ALLEGATIONS

<u>INTRODUCTION</u>

1.    At all times relevant to this Indictment, the defendants FILTHY FUHRER, a/k/a "Fuck Face," a/k/a Timothy Lobdell, ROY NAUGHTON, a/k/a "Thumper," GLEN BALDWIN, a/k/a "Glen Dog," COLTER O'DELL, CRAIG KING, a/k/a "Oakie," JUSTIN EATON, a/k/a "Skulls," and others, known and unknown, were members and associates of the 1488 gang (collectively, the "1488s"), a criminal organization whose members and associates engaged in narcotics distribution, firearms trafficking, and acts of

violence involving murder, assault, and kidnapping. At all times relevant to this Indictment, the 1488s operated throughout Alaska and elsewhere.

2.     The 1488 gang, including its leaders, members, and associates, constituted an "enterprise" as defined in 18 U.S.C. §§ 1959(b)(2) and 1961(4): that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objective of the enterprise.

3.     The 1488s were established in approximately 2010 (the precise date being unknown to the Grand Jury) by inmates serving sentences through the Alaska Department of Corrections. Spring Creek Correctional Center, a maximum-security prison in Seward, Alaska, served as the primary base of operations for the 1488s at all times relevant to this Indictment.

4.     The organizational structure of the 1488s was laid out in written rules widely distributed to members in correctional facilities across Alaska. The rules included procedures and a code of conduct.

5.     The 1488s employed Nazi-derived symbols to identify themselves and demonstrate their affiliation with the gang. Members often had tattoos incorporating one or more Nazi-style symbols including, but not limited to: the Iron Cross, the Swastika, and Schutzstaffel ("SS") lightning bolts. The most coveted tattoo of 1488s members was the 1488s "patch" (an Iron Cross superimposed over a Swastika), which could be worn only by fully made members who generally gained full membership by committing an act of

violence on behalf of the gang. The patch was designed by defendant FILTHY FUHRER and Unindicted Co-Conspirator A, incorporating imagery and motifs common to white-supremacist organizations.

6. The "14" in 1488s refers to a 14-word slogan used by white supremacists: "We must secure the existence of our people and a future for white children." The "88" refers to the 88 precepts written by white supremacist David Lane. The "88" also stands for "Heil Hitler," as "H" is the 8th letter of the alphabet.

7. In order to facilitate their operations, 1488 members represented themselves to the Department of Corrections as adherents of the "Asatru-Odinist" religion. 1488s used the time set aside for religious services to meet in relative privacy and discuss gang business. These meetings, which were mandatory for members, were referred to as "church."

8. 1488s members referred to the gang as "the Family" or "the Car" and to each other as "Brothers." The leaders of the enterprise were referred to as the "Key Holders" or having "the keys to the car." These leaders had ultimate authority in all gang matters. Subordinate members served to support the leaders and to enforce gang members' discipline and adherence to 1488s rules and laws. Each penal facility had a "Key Holder" who was responsible for all gang matters within the facilities where 1488s had a presence. Additionally, there were other "Key Holders" for various regions in "free world" Alaska. The 1488s had certain members who were responsible for enforcing the rules and to perform tasks as assigned by higher ranking gang members.

//

9. In order to maintain its influence and to be able to effectively engage in acts of violence and intimidation against others, the 1488s aggressively sought out and recruited prospective members. A prospect needed to be sponsored by an existing 1488 member. 1488s did not accept homosexuals, "rats," or individuals who had been charged with sex offenses. Once sponsored, a prospect had to serve a term of 8 to 14 months, during which he was observed by 1488s members. During this period, the prospect was required to learn the 1488s rules and regulations, to familiarize himself with the Nazi-inspired white supremacist ideology, and to demonstrate loyalty and commitment by engaging in acts of violence as directed by the 1488 leadership. Prospects were considered part of the 1488s "family" and entitled to the full protection of the gang. At the end of the prospect's term, his final admission was submitted to the full 1488s membership for a vote. The vote to admit had to be unanimous.

10. In addition to members and prospects, the 1488s were assisted by "associates" who facilitated the operations of the enterprise. Although women were not allowed to become members, 1488 members frequently used their wives and girlfriends as confederates in their criminal activity; other friends, acquaintances, and family members also served as associates. Female associates of the 1488s were referred to as "lady-eights". The 1488s relied on associates to acquire firearms and narcotics, to assist in criminal activity to raise funds, and to facilitate smuggling contraband (including narcotics and weapons) into correctional facilities.

11. Once released from incarceration, 1488s members were required to remain loyal to the 1488s and were required to report to designated leaders to further the goals of

the 1488s through criminal activity. Out of custody members were required to attend gang meetings held to discuss and conduct 1488s gang business, which were referred to as "church" or "barbecues." 1488s members would engage in various criminal activities on behalf of and to gain standing within the enterprise. In particular, violence against law enforcement was an accepted means of gaining standing within the 1488s.

12.     Membership in the 1488s was considered a lifelong commitment. Members who were perceived as having disobeyed the rules of the enterprise or engaged in disloyal conduct were subject to discipline and punishment. Severe transgressions were punished by "depatchings" and expulsion from the enterprise. A depatching would, at a minimum, involve restraining the victim for the forcible erasure, obliteration, defacement, or removal of the signature 1488 tattoo. Depatchings could also involve brandishing firearms and other weapons; the tattooing of additional degrading words and images; beatings with fists, weapons, and other dangerous implements; prolonged physical torture; burning the tattooed skin from the body; and, in at least one case, the death of the offending 1488 member.

13.     In or about 2016, FUHRER and Unindicted Co-Conspirator A remained incarcerated and were limited in their ability to maintain control of many of the 1488 members. FUHRER and Unindicted Co-Conspirator A believed that members would defy the 1488 code of conduct, which would diminish the perceived power and influence of the enterprise both within and outside of the state prison system.   Thus, FUHRER and Unindicted Co-Conspirator A became more aggressive in their efforts to impose discipline on members believed to have violated the rules of the 1488 enterprise.

<u>PURPOSES OF THE ENTERPRISE</u>

14.    The purposes of the 1488s criminal enterprise included the following:

a.  Enriching, preserving, expanding, and protecting the power, influence, and prestige of the enterprise, both in the prison hierarchy and in parts of the "free world," through the use of intimidation, violence, and threats of violence, to include murder, attempted murder, and assault;

b.  Promoting and enhancing the enterprise and its members' and associates' activities;

c.  Sharing and disseminating information about the enterprise's plans and activities among members and associates of the enterprise;

d.  Protecting the enterprise and its members from detection, apprehension, and prosecution by using witness intimidation to obstruct law enforcement's investigation of members of the enterprise;

e.  Obtaining firearms for use by members of the enterprise to facilitate the commission of crimes by other members and associates of the enterprise;

f.  Using intimidation, violence, and threats of violence against known and suspected rival gang members, rival drug dealers, and various individuals; and

g.  Espousing and advancing white supremacist views through acts and threatened acts of intimidation and violence.

//

//

## MANNER AND MEANS OF THE ENTERPRISE

15.     The manner and means by which the leaders, members, and associates conducted and participated in the conduct of the affairs of the 1488s criminal enterprise included the following:

a.  The leaders of the enterprise directed, sanctioned, approved, and permitted other members and associates of the enterprise to carry out acts in furtherance of the enterprise;

b.  Members and associates committed, conspired to commit, agreed to commit, and threatened to commit acts of violence, including acts involving murder, kidnapping, robbery, assault, intimidation, witness tampering, and maiming to protect the enterprise's power and influence and to perpetuate the enterprise;

c.  Members and associates, at the direction of leaders, committed acts of violence, including acts involving murder, kidnapping, assault, intimidation, and maiming, where needed to discipline errant members of the 1488s and punish conduct that would bring the enterprise into disrepute;

d.  To generate income, 1488s members and associates engaged in illegal activities under the protection of the enterprise, including narcotics trafficking, weapons trafficking, and other illegal activities;

e.  For protection and to carry out criminal conduct, 1488s members and associates illegally acquired, carried, and used firearms;

f.  Members and associates of the enterprise employed and used gang-related

terminology, symbols, phrases, and gestures to demonstrate affiliation with the gang;

g. Members and associates used instrumentalities of interstate commerce including telephones and the United States mail in order to communicate and facilitate their illegal conduct. Members of the enterprise talked in code when communicating over the telephone and/or in writing to avoid law enforcement detection; and

h. Members and associates of the enterprise were forbidden from cooperating with law enforcement. Members, prospective members, and associates were compelled to submit their legal paperwork and discovery, which was actively reviewed for signs of cooperation with law enforcement.

<u>THE DEFENDANTS</u>

16.     The defendant FILTHY FUHRER was a founding member of the 1488s and was, at all times relevant to this Indictment, its principal leader. Inspired by other prison-based gangs, FUHRER was responsible for developing and promoting the white-supremacist ideology of the 1488s, and for implementing the Nazi iconography. FUHRER legally changed his name from "Timothy Lobdell" in 2017, and was also known to other 1488s as "Fuck Face" or "Face" due to a now-covered facial tattoo of the word "Fuck." At all times relevant to this Indictment, FUHRER was incarcerated at Spring Creek Correctional Center, where he directed and maintained supervisory control over other 1488s members in that facility, in other prisons, and throughout Alaska.

//

17.     The defendant ROY NAUGHTON was, beginning in approximately 2016, the appointed "Key Holder," or leader, of the out-of-custody 1488s in the Anchorage area. NAUGHTON was chosen for this role because it was believed he would be able to appropriately discipline 1488 members who were in violation of the enterprise's rules. NAUGHTON was known to other 1488s as "Thumper" due to his reputation for violence.

18.     The defendant GLEN BALDWIN was a fully-patched member of the 1488s. He lived with his girlfriend in Wasilla, and facilitated criminal conduct throughout Anchorage and the Matanuska-Susitna Valley. He was also known to other 1488s as "Glen Dog."

19.     The defendant COLTER O'DELL was sponsored as a 1488 prospect by BALDWIN. He was admitted as a full member in August 2017 for assisting the 1488s in the commission of a murder, and has since received a full 1488 patch.

20.     The defendant CRAIG KING was an associate of the 1488s, and at all times relevant to this Indictment, a self-proclaimed member of the Hells Angels, an outlaw motorcycle gang. KING trafficked narcotics from his residence in Wasilla, Alaska, and supplied narcotics to several 1488s, including BALDWIN. Because of his association with the 1488s, KING understood the nature, organization, and purposes of the enterprise. KING was also known by the nickname "Oakie."

21.     The defendant JUSTIN EATON was, at all times relevant to this Indictment, a fully patched 1488 who has principally operated in the Anchorage area. He was known to other 1488 members as "Skulls."

//

22.     The defendant Felicia King is the wife of CRAIG KING and, at all times relevant to this Indictment, resided with him in Wasilla, Alaska. She was aware of her husband's narcotics trafficking and his association with the 1488s.

<u>COUNT 1</u>
<u>RACKETEERING CONSPIRACY</u>

23.     Paragraphs 1 through 22 of the General Allegations Section are hereby realleged and incorporated as if set forth fully herein.

24.     From a date unknown, but from at least in or about the year 2010, up through and including September 2017, both dates being approximate and inclusive, within the District of Alaska, the defendants, FILTHY FUHRER, also known as "Fuck Face," ROY NAUGHTON, also known as "Thumper," GLEN BALDWIN, also known as "Glen Dog," COLTER O'DELL, CRAIG KING, also known as "Oakie," and JUSTIN EATON, also known as "Skulls," together with others known and unknown to the Grand Jury, being persons employed by and associated with the 1488s, an enterprise as described more fully above, which engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with one another to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), consisting of multiple acts involving:

//

//

a. Murder, in violation of Alaska Stat. §§ 11.41.100(a)(1)(A), 11.41.110(a)(1), 11.41.110(a)(2), 11.41.110(a)(3), 11.41.110(a)(4), 11.16.110, 11.31.100, 11.31.110, and 11.31.120;

b. Kidnapping, in violation of Alaska Stat. §§ 11.41.300(a)(1)(C), 11.41.300(a)(1)(E), 11.16.110, 11.31.100, 11.31.110, and 11.31.120;

c. Arson, in violation of Alaska Stat. §§ 11.46.420(a), 11.16.110, 11.31.100, 11.31.110, and 11.31.120; and

multiple acts indictable under:

a. 18 U.S.C. §§ 1512 (relating to tampering with a witness, victim, or an informant); and multiple offenses involving narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute and possess with intent to distribute a controlled substance).

25.     It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## OVERT ACTS

26.     In furtherance of the conspiracy and to achieve the object and purposes thereof, the defendants, and others known and unknown to the Grand Jury, performed or caused to be performed the following overt acts, among others, in the District of Alaska:

a. In or about 2015 and 2016, the precise dates being unknown to the Grand Jury, 1488 member Michael Staton, also known as "Steak Knife," lived with

defendants Felicia King and CRAIG KING. CRAIG KING told a number of 1488 members and associates about his displeasure with Staton due to the theft of items from the KINGs, to include drugs, jewelry, and CRAIG KING's valuable Hells Angels "cuts," or motorcycle vests. KING requested assistance in locating Staton so that KING could retaliate against him.

b. In or about 2016, FUHRER and Unindicted Co-Conspirator A tasked Nicholas Kozorra with enforcing discipline among 1488 members following Kozorra's upcoming release, and provided him with a list of 1488 members who needed to be punished.

c. On or about September 16, 2016, FUHRER called NAUGHTON. FUHRER and NAUGHTON identified several 1488 members who needed to be disciplined. NAUGHTON asked permission to violently discipline Staton, because he had stolen from the Hells Angels and from NAUGHTON himself. FUHRER initially did not grant permission, and gave NAUGHTON further direction on what he needed to do before he would receive the "green light" from FUHRER. The call ended with FUHRER saying he would call back with a decision.

d. On or about September 16, 2016, following the phone call with NAUGHTON, FUHRER spoke with Unindicted Co-Conspirator A. Approximately 19 minutes after the first phone call, FUHRER called NAUGHTON back, explaining that he had spoken with the "home boy" and that it was a "go" on "ole Steak Knife." FUHRER reminded NAUGHTON

actions "on that level", and "very, very weighty decisions" needed to go through him.

e.  On or about September 16, 2016, NAUGHTON began tasking 1488 members with locating Staton so that the ordered punishment could be carried out.  One of the 1488 members ordered to find Staton was Dustin Clowers.

f.  On or about February 7, 2017, Clowers spoke with FUHRER by phone. FUHRER explained that he would send an "outline of acts" that Clowers was to carry out "as close as possible."

g.  In or about March 2017, Kozorra was released from Spring Creek Correctional Center, and began to assume control of 1488 operations in "free world" Anchorage.  He set about making arrangements to discipline the 1488 members on the list he had been given by FUHRER and Unindicted Co-Conspirator A.

h.  In or about March 2017 to in or about August 2017, CRAIG KING continued trying to locate Staton.

i.  In or about April 2017, 1488 leadership believed that 1488 member Jermiah Johnson, also known as "Mountain," had cooperated with law enforcement in a case involving a close associate of Unindicted Co-Conspirator A. Consequently, FUHRER and Unindicted Co-Conspirator A ordered Johnson's depatching.

//

j.  On or about April 2, 2017, Kozorra met with Johnson under the pretense of taking him to a 1488 "barbecue," or gang meeting. Kozorra took Johnson to NAUGHTON's house, where other 1488 members, including NAUGHTON, EATON, Clowers, and others known and unknown to the Grand Jury, were waiting.

k.  On or about April 2, 2017, Kozorra and Clowers held Johnson at gunpoint. Johnson was beaten by NAUGHTON, EATON, NAUGHTON and others known and unknown to the Grand Jury, and had a lightbulb shattered in his mouth.

l.  On or about April 2, 2017, Johnson's 1488 patch, tattooed on his body, was obliterated and he was crudely and forcibly tattooed with the word "snitch" or "bitch," and with a derogatory racial epithet next to a heart.  Photographs were taken by 1488 members of Johnson's new tattoos.

m.  On or about April 2, 2017, the 1488s present at Johnson's depatching, to include EATON, threatened Johnson, warning him that if he reported the beating to the police, they would put information about his snitching and depatching on Facebook.

n.  On or about July 18, 2017, FUHRER spoke with NAUGHTON by phone, and told him of the successful depatching of Johnson. NAUGHTON stated that the 1488s planned to depatch member Jeremy Smith, also known as "Cub," within the next few days. FUHRER approved of the plan, stating that "Cub" had been "a thorn in [his] side." NAUGHTON also confirmed that

Kozorra had taken over management of the 1488s in the free world at Unindicted Co-Conspirator A's direction.

o. On or about July 20, 2017, Kozorra and Clowers lured Smith to a trailer in Anchorage in order to depatch him. They held him at gunpoint and began forcibly obliterating his tattooed 1488 patch. Kozorra heated a knife with a propane torch and used the blade to burn off the tattoo.

p. On or about August 3, 2017, Kozorra contacted Staton and convinced him to come to Anchorage from the Kenai Peninsula, driving a stolen Chevy Malibu.

q. On or about August 3, 2017, Clowers got into the Malibu with Staton. He then texted CRAIG KING to tell him he was with Staton.

r. On or about August 3, 2017, CRAIG KING and Felicia King were living in a duplex in Wasilla, with a vacant adjoining unit. CRAIG KING directed Beau Cook to prepare a room in the vacant adjoining unit for the beating of Staton.

s. On or about August 3, 2017, Cook placed painter's plastic on the floor and walls in preparation for Staton's beating.

t. On or about August 3, 2017, Clowers, Kozorra, and Staton arrived at a vacant house in Wasilla, where they met O'DELL and BALDWIN.

//

//

u.  On or about August 3, 2017, Kozorra and Clowers, along with O'DELL and BALDWIN, beat Staton, tied him up, and secured him in the trunk of the stolen Malibu. They then drove to the KINGS' duplex in the Malibu and a red Chevrolet Tahoe.

v.  On or about August 3, 2017, Staton attempted to escape. Staton was captured and beaten again. He was forced back into the Malibu with Kozorra to prevent another escape.

w.  On or about August 3, 2017, Clowers, Kozorra, O'DELL, BALDWIN, and KING brought Staton into the room that had been draped in painter's plastic, and savagely beat him.

x.  On or about August 3, 2017, Kozorra heated a military-style knife with a propane torch and melted the 1488 tattoo off Staton's body.

y.  On or about August 3, 2017, Clowers, Kozorra, O'DELL, BALDWIN, and KING prepared to execute Staton and dispose of his body. They rolled him up in painter's plastic and carpeting and took him outside.

z.  On or about August 3, 2017, once Staton was hauled outside in the plastic and carpet, Felicia King kicked him and yelled at him because he had stolen from them.

aa. On or about August 3, 2017, CRAIG KING directed all the men who were in the room during Staton's beating to remove their clothes and place them in a burn barrel.

//

bb. On or about August 3, 2017, Felicia King gave fresh clothes to the participants, and helped burn their old clothes in the barrel.

cc. On or about August 3, 2017, Felicia King and Cook then cleaned up the vacant unit where the beating took place.

dd. On or about August 3, 2017, O'DELL and BALDWIN loaded Staton, still wrapped in plastic and carpeting, and on the verge of death, into the back of the red Chevrolet Tahoe.

ee. On or about August 3, 2017, BALDWIN received a call from Unindicted Co-Conspirator B. BALDWIN told Unindicted Co-Conspirator B that he was in the middle of committing a murder.

ff. On or about August 3, 2017, O'DELL and BALDWIN drove Staton to the woods, executed him with a .380 caliber firearm, and burned his body.

gg. On or about August 3, 2017, BALDWIN began tattooing a 1488 patch on O'DELL's right side, before getting too tired to complete it in one sitting.

hh. On or about August 3, 2017, CRAIG KING provided narcotics to Kozorra and Clowers for their part in the Staton murder.

ii. On or about August 4, 2017, Kozorra ordered Unindicted Co-Conspirator C, a 1488 member, to destroy the stolen Malibu that Staton had driven to Anchorage. He used the vehicle for a short period of time and tried to light the front seat on fire.

jj. On or about August 5, 2017, Kozorra asked Unindicted Co-Conspirator C to verify that he had successfully burned the Malibu.

kk. On or about August 5, 2017, BALDWIN, O'DELL, Kozorra, and Unindicted Co-Conspirator C went to the location where Unindicted Co-Conspirator C had attempted to burn the Malibu, and saw that the fire had burned the front seat but otherwise had left the Malibu largely intact.

ll. On or about August 5, 2017, O'DELL drove Unindicted Co-Conspirator C around to occupy him while BALDWIN and Kozorra took the Malibu to a different location and successfully burned it.

mm. On or about August 5, 2017, Unindicted Co-Conspirator C was taken to Unindicted Co-Conspirator D's residence, where he was depatched for failing to burn the Malibu. His patch was tattooed over.

nn. On or about October 22, 2017, O'DELL called Unindicted Co-Conspirator E. He told her that he was going to give her the number of a top person who ran with the "Samoans." He told her to call this person and to play for him a recording of Unindicted Co-Conspirator D's statement to law enforcement, so that this individual would listen to it and "shut that shit the fuck down."

27.    All in violation of 18 U.S.C. § 1962(d).

<u>COUNT 2</u>
<u>VIOLENT CRIMES IN AID OF RACKETEERING ("VICAR") CONSPIRACY</u>

28.    Paragraphs 1 through 22 of the General Allegations Section are hereby realleged and incorporated as if set forth fully herein.

29.    The 1488 enterprise, through its members and associates, engaged in racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), that is, acts

involving kidnapping, in violation of Alaska Stat. § 11.41.300, and offenses involving narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute and possess with intent to distribute a controlled substance).

30.     From in or about 2016 to in or about August, 2017, within the District of Alaska and elsewhere, for the purpose of gaining entrance to and maintaining and increasing position in the 1488s, an enterprise engaged in racketeering activity, the defendants, FILTHY FUHRER, ROY NAUGHTON, GLEN BALDWIN, COLTER O'DELL, and CRAIG KING, did conspire with one another and with other persons known and unknown to the grand jury to kidnap Michael Staton, in violation of Alaska Stat. § 11.41.300, and to assault Michael Staton with a deadly weapon and with intent to inflict serious bodily injury in violation of Alaska Stat. § 11.41.200.

31.     All of which is in violation of 18 U.S.C. § 1959(a)(5) and (a)(6).

COUNT 3
KIDNAPPING CONSPIRACY

32.     From at least 2016, the exact date being unknown to the Grand Jury, and continuing until and including at least August 3, 2017, within the District of Alaska, the defendants, FILTHY FUHRER, ROY NAUGHTON, GLEN BALDWIN, COLTER O'DELL, and CRAIG KING, knowingly and intentionally combined, conspired, confederated and agreed together and with each other, and with other persons known and unknown to the Grand Jury, to kidnap Michael Staton using a means, facility, and

instrumentality of interstate commerce, and did commit overt acts in furtherance of this conspiracy, including but not limited to:

    a. Communicating in person and through phone calls and texts messages to coordinate the kidnapping of Michael Staton;

    b. Placing phone calls and sending text messages in an effort to ascertain Staton's location;

    c. Contacting Staton to induce him to come to Anchorage;

    d. Driving Staton from Anchorage to Wasilla;

    e. Beating, torturing, intimidating, and assaulting Staton;

    f. Restraining Staton in a vehicle;

    g. Preparing a room with painter's plastic;

    h. Disposing of evidence of Staton's kidnapping; and

    i. Murdering Staton.

33. All of which is in violation of 18 U.S.C. § 1201(c).

COUNT 4
KIDNAPPING RESULTING IN DEATH

34. On or about August 3, 2017, within the District of Alaska, the defendants, FILTHY FUHRER, ROY NAUGHTON, GLEN BALDWIN, COLTER O'DELL, AND CRAIG KING, did unlawfully and willfully seize, confine, inveigle, decoy, kidnap, abduct and carry away for reward and otherwise Michael Staton using telephones, a means, facility, and instrumentality of interstate commerce, in committing and in furtherance of the offense, which kidnapping resulted in death.

35.     All of which is in violation of 18 U.S.C. §§ 1201(a)(1) and 2.

## COUNT 5
## VICAR MURDER

36.     Paragraphs 1 through 22 of the General Allegations Section are hereby realleged and incorporated as if set forth fully herein.

37.     The 1488 enterprise, through its members and associates, engaged in racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), that is, acts involving kidnapping, in violation of Alaska Stat. § 11.41.300, and offenses involving narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute and possess with intent to distribute a controlled substance).

38.     On or about August 3, 2017, within the District of Alaska, the defendants, FILTHY FUHRER, ROY NAUGHTON, GLEN BALDWIN, COLTER O'DELL, and CRAIG KING, for the purpose of gaining entrance to and maintaining and increasing position in the 1488s, an enterprise engaged in racketeering activity, murdered Michael Staton in violation of Alaska Stat. §§ 11.41.100(a), 11.41.110(a), and 11.16.110.

39.     All of which is in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

## COUNT 6
## ACCESSORY AFTER THE FACT

40.     On or about August 3, 2017, within the District of Alaska, the defendant, FELICIA KING, knowing that the offenses against the United States charged in Count 2, Count 3, and Count 4 had been committed, did receive, relieve, comfort, and assist the defendants GLEN BALDWIN, COLTER O'DELL, CRAIG KING, and others, known and

unknown to the Grand Jury, in order to hinder and prevent their apprehension, trial, and punishment.

41.     All of which is in violation of 18 U.S.C. § 3.

COUNT 7<br>KIDNAPPING CONSPIRACY

42.     From at least 2017, the exact date being unknown to the Grand Jury, and continuing until and including at least July 20, 2017, within the District of Alaska, the defendants, FILTHY FUHRER and ROY NAUGHTON, knowingly and intentionally combined, conspired, confederated and agreed together and with each other, and with other persons known and unknown to the Grand Jury, to kidnap Jeremy Smith using a means, facility, and instrumentality of interstate commerce, and did commit overt acts in furtherance of this conspiracy, including but not limited to:

   a.  Communicating in person and through phone calls and texts messages to coordinate the kidnapping of Smith;

   b.  Driving Smith to a trailer in Anchorage;

   c.  Restraining Smith at gunpoint;

   d.  Forcibly defacing and obliterating Smith's 1488 tattoo; and

   e.  Implicitly and expressly threatening and intimidating Smith to dissuade him alerting law enforcement.

43.     All of which is in violation of 18 U.S.C. § 1201(c).

//

//

<u>COUNT 8</u>
<u>KIDNAPPING</u>

44.     On or about July 20, 2017, within the District of Alaska, the defendants, FILTHY FUHRER and ROY NAUGHTON, did unlawfully and willfully seize, confine, inveigle, decoy, kidnap, abduct and carry away for reward and otherwise Jeremy Smith using telephones, a means, facility, and instrumentality of interstate commerce, in committing and in furtherance of the offense.

45.     All of which is in violation of 18 U.S.C. §§ 1201(a)(1) and 2.

<u>COUNT 9</u>
<u>VICAR ASSAULT</u>

46.     Paragraphs 1 through 22 of the General Allegations Section are hereby realleged and incorporated as if set forth fully herein.

47.     The 1488 enterprise, through its members and associates, engaged in racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), that is, acts involving kidnapping, in violation of Alaska Stat. § 11.41.300, and offenses involving narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute and possess with intent to distribute a controlled substance).

48.     On or about July 20, 2017, within the District of Alaska, the defendants, FILTHY FUHRER and ROY NAUGHTON, for the purpose of gaining entrance to and maintaining and increasing position in the 1488s, an enterprise engaged in racketeering activity, did assault Jeremy Smith with a dangerous weapon in violation of Alaska Stat. § 11.41.210(a).

49.     All of which is in violation of 18 U.S.C. §§ 1959(a)(3) and 2.

COUNT 10<br>KIDNAPPING CONSPIRACY

50.     From at least 2017, the exact date being unknown to the Grand Jury, and continuing until and including at least April 2, 2017, within the District of Alaska, the defendants, FILTHY FUHRER, ROY NAUGHTON, and JUSTIN EATON, knowingly and intentionally combined, conspired, confederated and agreed together and with each other, and with other persons known and unknown to the Grand Jury, to kidnap Jermiah Johnson using a means, facility, and instrumentality of interstate commerce, and did commit overt acts in furtherance of this conspiracy, including but not limited to:

    a.  Communicating in person and through phone calls and texts messages to coordinate the kidnapping of Johnson;

    b.  Driving Johnson to the home of the defendant ROY NAUGHTON;

    c.  Restraining Johnson at gunpoint;

    d.  Beating, torturing, and assaulting Johnson with fists, feet, and implements;

    e.  Forcibly defacing and obliterating Johnson's 1488 tattoo; and

    f.  Implicitly and expressly threatening and intimidating Johnson to dissuade him alerting law enforcement.

51.     All of which is in violation of 18 U.S.C. § 1201(c).

COUNT 11<br>KIDNAPPING

52.     On or about April 2, 2017, within the District of Alaska, the defendants, FILTHY FUHRER, ROY NAUGHTON, and JUSTIN EATON,  did unlawfully and

willfully seize, confine, inveigle, decoy, kidnap, abduct and carry away for reward and otherwise Jermiah Johnson using telephones, a means, facility, and instrumentality of interstate commerce, in committing and in furtherance of the offense.

53. All of which is in violation of 18 U.S.C. §§ 1201(a)(1) and 2.

COUNT 12<br>VICAR ASSAULT

54. Paragraphs 1 through 22 of the General Allegations Section are hereby realleged and incorporated as if set forth fully herein.

55. The 1488 enterprise, through its members and associates, engaged in racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), that is, offenses involving narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute and possess with intent to distribute a controlled substance).

//

//

//

//

//

//

//

//

//

56. On or about April 2, 2017, within the District of Alaska, the defendants, FILTHY FUHRER, ROY NAUGHTON, and JUSTIN EATON, for the purpose of gaining entrance to and maintaining and increasing position in the 1488s, an enterprise engaged in racketeering activity, did assault Jermiah Johnson with a dangerous weapon in violation of Alaska Stat. § 11.41.210(a).

57. All of which is in violation of 18 U.S.C. §§ 1959(a)(3) and 2.

A TRUE BILL.


s/ Grand Jury Foreperson
GRAND JURY FOREPERSON



s/ William A. Taylor
WILLIAM A. TAYLOR
Assistant U.S. Attorney
United States of America



s/ Bryan Schroder
BRYAN SCHRODER
United States Attorney
United States of America


DATE:     October 21, 2020